J14PPENH

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        18 CR 637 (JSR)

 5   KENNY PENA, RICHIE HILARIO,

 6              Defendants.              Suppression Hearing
                                        (Resumed)
 7   ------------------------------x

 8                                      New York, N.Y.
                                        January 4, 2019
 9                                      10:09 a.m.

10   Before:

11                  HON. JED S. RAKOFF,

12                                      District Judge

13

14                      APPEARANCES

15

16   GEOFFREY S. BERMAN,
          United States Attorney for the
          Southern District of New York
17   PETER JOHN DAVIS
     MAURENE RYAN COMEY
18        Assistant United States Attorneys

19   KELLEY J. SHARKEY
          Attorney for Defendant Pena
20
     PATRICK JAMES JOYCE
21        Attorney for Defendant Hilario

22
     ALSO PRESENT:  HANNAH HARNEY, Paralegal Specialist, USAO
23                  FIDEL SANTIAGO, Detective, NYPD

24

25
```

```
 1                 (In open court)

 2                 (Case called)

 3                 THE COURT:  All right.  Now you can call your first

 4     witness.

 5                 MR. DAVIS:  Thank you, your Honor.  The government

 6     calls Officer Joshua Thomas, your Honor.

 7                 THE DEPUTY CLERK:  Please take the witness stand.

 8     JOSHUA THOMAS,

 9          called as a witness by the Government,

10          having been duly sworn, testified as follows:

11                 THE COURT:  Counsel.

12                 MR. DAVIS:  Thank you, your Honor.

13     DIRECT EXAMINATION

14     BY MR. DAVIS:

15     Q.  Where do you work?

16     A.  I work at the 30th precinct.

17     Q.  And what is your title?

18     A.  Police officer.

19     Q.  And how long have you worked at the 30th precinct?

20     A.  For about two years.

21     Q.  And when did you join the New York Police Department?

22     A.  January 4th, 2017.

23     Q.  Okay.  Officer Thomas, I want to direct your attention to

24     August 9th, 2018.  Were you working that night?

25     A.  Yes, I was.
```

1    Q.  And what shift were you working on August 9th, 2018?

2    A.  I was doing a modified tour.  I worked from that night

3    until the next day.

4    Q.  And so what day did your shift start?

5    A.  On the 9th.

6    Q.  And when did your shift end?

7    A.  On the 10th.

8    Q.  Did you have a partner that night?

9    A.  Yes, I did.

10   Q.  And who was your partner?

11   A.  It was Officer Delia.

12   Q.  And were you in uniform or plain clothes?

13   A.  I was in uniform.

14   Q.  What mode of transportation were you using that night?

15   A.  We used a marked patrol car.

16   Q.  Who was driving the car?

17   A.  My partner, Officer Delia.

18   Q.  Okay.  Officer Thomas, I want to now direct your attention

19   to approximately 11:50 p.m. on the night of August 9th, 2018.

20   What, if anything, happened at that time during your shift?

21   A.  As we was driving southbound on Broadway, we got a radio

22   run that there were shots fired on West 139th Street.

23   Q.  And what do you mean by a "radio run"?

24   A.  Just that another police officer put over the radio that

25   there were shots fired in the vicinity.

1    Q.  Okay.  And where were you driving at the time that you

2    heard that communication?

3    A.  Southbound on Broadway.

4    Q.  And what did you do right after you heard the shots fired

5    call over the radio?

6    A.  We immediately decided to keep on going southbound, and we

7    also heard that there was -- someone else called over the radio

8    come to Riverside Drive; so we turned right onto West 143 to

9    get to Riverside Drive.

10   Q.  Around what location did you hear the shots fired?

11   A.  It was on West 139.

12   Q.  Okay.  So what did you do next with respect to the shots

13   fired call?

14   A.  We immediately tried to get over to the location where they

15   put it over.  We didn't see anyone on West 139; so that's when

16   we made the right on 143 to get to Riverside Drive.

17   Q.  And to be clear, when you say the location where they put

18   it over, what location were you referring to?

19   A.  It was West 139 Street and Broadway.

20   Q.  And so I know you said that you tried to go to the

21   location.  How did you get there?

22   A.  Well, we was still in the car when everything came over.

23   Q.  Okay.  And so when you arrived at that location, West 139,

24   what did you do next?

25   A.  We immediately made a right because we didn't see anyone on

J14PPENH                         Thomas - Direct

1   the corner of 139.

2   Q.  And what did you do after you arrived at the corner of 139?

3   A.  We went down to Riverside Drive.

4   Q.  And what happened next when you arrived at Riverside Drive?

5   A.  We still didn't see anyone there; so we decided to go to

6   136, and we made a left on 136 to get to Broadway because, at

7   the time, we also heard another radio run stating that the 26

8   precinct had someone, a suspect in custody on 12th Avenue.

9   Q.  Okay.  And so after you heard that there was a suspect

10  stopped on 12th Avenue, what did you do next?

11  A.  Like I was saying, we went -- we made a left on 136 to get

12  to Broadway, and then made a right on Broadway to get to 133

13  because the only way down to 12th Avenue from Riverside Drive

14  is through 133.

15  Q.  And so where did you end up parking your RMP?

16  A.  On 12th Avenue and 136, 137.

17  Q.  And when you first arrived in your RMP around that

18  location, what did you see?

19  A.  We saw a 26 marked RMP, or a marked patrol car, and we also

20  saw that another 26 officer trying to put cuffs on the suspect

21  they stopped.

22  Q.  And so after you saw the 26 officer trying to put cuffs on

23  the suspect, what did you do next?

24  A.  Me and my partner immediately got out of our marked patrol

25  car and we assisted.

1    Q.  And how did you try to assist?

2    A.  Well, the 26 officer already had one cuff on his hand; so I

3    just put the other cuff on his hand as well.

4    Q.  And what, if anything, did you notice about the suspect you

5    placed that cuff on, that suspect's clothing?

6    A.  He was wearing a yellow and black Pirates jersey and also

7    jean shorts.

8    Q.  Okay.  And what, if anything, did you do next?

9    A.  I did a brief search of his person.  I took his wallet,

10   cell phone, money.  Whatever he had in his pocket, I took it

11   out, and I put it on the 26 patrol car.

12   Q.  And you mentioned a wallet, cell phone and money.  Did you

13   find anything else in there?

14   A.  Yes, there was also a sock.

15   Q.  Okay.  And you may have said this, but where did you

16   retrieve those items from on his person?

17   A.  From his left pocket.

18   Q.  And at the time you pulled the sock from Mr. Pena's pocket,

19   did you know what was inside of it?

20   A.  No, I did not.

21   Q.  What, if any, interactions did you have with the other

22   suspect being detained?

23   A.  I did not have any interaction because we decided to

24   separate them.

25   Q.  Okay.  And after you searched the first suspect's pockets,

J14PPENH                      Thomas - Direct

1   what did you do next?

2   A.  I put all his belongings on top of the 26 patrol car, and

3   then we waited for further assistance and for our supervisor to

4   get onto the scene.

5   Q.  And so after you waited, what did you do next with respect

6   to the suspect you had detained?

7   A.  Well, we -- like I said, we just waited for the supervisor

8   to get on the scene.  He was in cuffs, and we were just waiting

9   by the patrol car.

10  Q.  Did your supervisor end up arriving on the scene?

11  A.  Yes, he did.

12  Q.  What happened after your supervisor arrived on the scene?

13  A.  He told us to do a good search because he was going back to

14  the 30 precinct.

15  Q.  And during that second search -- did you conduct a second

16  search?

17  A.  Yes, I did.

18  Q.  And what, if anything, did you find during that second

19  search?

20  A.  I had found a piece of tissue in his waistband.

21  Q.  And just stepping back for a second, we were speaking about

22  your supervisor earlier.  Who is your supervisor?

23  A.  Lieutenant Reed.

24  Q.  And you were saying you found something in the suspect's

25  waistband during the second search?

1   A.  Yes.  It was a tissue.

2   Q.  Okay.  And so after you conducted the second search, what

3   did you do next?

4   A.  We decided to put him in one of our precinct's marked

5   patrol cars, and then once he was inside, I decided to go

6   through his belongings to make sure there was nothing else

7   inside of the tissue or the sock or whatever.

8   Q.  And what, if anything, did you find?

9   A.  I found one round in his sock, and I found what appeared to

10  be drugs in the tissue.

11  Q.  When you say one round in the sock, what do you mean by "a

12  round"?

13  A.  Well, just one bullet.

14  Q.  And did you wear a body cam that night?

15  A.  Yes, I did.

16  Q.  And how long had you been using a body cam before that

17  night?

18  A.  Probably about two weeks to a month.

19  Q.  And did you turn your body camera on that night?

20  A.  Yes, I did.

21  Q.  And when did you turn it on?

22  A.  When he was already in custody.

23  Q.  And why did you turn it on then?

24  A.  Because I felt the need that it was important to have it

25  on.

J14PPENH                    Thomas - Direct

1    Q.  Okay.  Officer Thompson, I'm now going to play what's been

2    admitted into evidence as Government Exhibit 302.

3              MR. DAVIS:  Ms. Harney, will you please play

4    Government Exhibit 302, starting at 11:30 on the run time and

5    then pausing at the time stamp in the upper left, where it's

6    32:55.

7              (Video being played)

8              MR. DAVIS:  I'm sorry, a brief pause there.

9    Q.  Officer Thomas, could you please explain to the Court what

10   was going on at the time?

11   A.  At the time, we was waiting for our supervisor to get on

12   the scene.  The suspect already had cuffs on, and he was

13   waiting by the 26 patrol cars.

14   Q.  And who do we hear speaking on that?

15   A.  That was me.

16   Q.  And who is the person in front of you, right there?

17   A.  It's the suspect with the Pirates jersey.

18             MR. DAVIS:  Okay.  Ms. Harney, can we please play from

19   11:50 and then pausing at time stamp 33:16.

20             (Video being played)

21             MR. DAVIS:  Why don't we pause there.

22   Q.  Officer Thomas, who was just speaking?

23   A.  Lieutenant Reed.

24   Q.  And what was he saying?

25   A.  He was saying transfer back to the house, which is transfer

J14PPENH                    Thomas - Direct

1   to the 30 precinct, and then he said "good toss, good toss."

2   Q.  What did you interpret "good toss, good toss" to mean?

3   A.  It's a very thorough search of the person.

4   Q.  And why were you doing a good toss?

5   A.  To make sure he didn't have anything else on him.

6          MR. DAVIS:  Ms. Harney, can you play it from about

7   12:10 to 33:30.

8          (Video being played)

9          MR. DAVIS:  Let's pause there.

10  Q.  Officer Thomas, what just happened?

11  A.  I found the tissue in his waistband and put the tissue in a

12  hat that was on the 26 patrol car.

13         MR. DAVIS:  And, Ms. Harney, could you please play

14  from 12:25 to time stamp 34:55.

15         (Video being played)

16  Q.  Officer Thomas, what just happened there?

17  A.  Well, we put the suspect in the 30 patrol car, and after

18  that point, I just actually searched through the sock and

19  whatever was on the person, and I found a loose round or one

20  single bullet.

21  Q.  And who were you speaking to?

22  A.  Lieutenant Reed.

23         MR. DAVIS:  Okay.  Ms. Harney, can we fast forward to

24  15:09, and then we'll play to time stamp 37:21.

25         (Video being played)

1   Q.  Officer Thomas, what just happened there?

2   A.  Lieutenant Reed, he came over to me and I showed him what I

3   found in the tissue, and he confirmed that it was drugs.

4   Q.  And where did you find those drugs?

5   A.  The drugs were in the tissue I retrieved from his

6   waistband.

7              MR. DAVIS:  May I have a minute, your Honor?

8              THE COURT:  Yes.

9              MR. DAVIS:  No further questions.

10              THE COURT:  Cross-examination.

11   CROSS-EXAMINATION

12   BY MS. SHARKEY:

13   Q.  Good morning, Officer.

14   A.  Good morning.

15   Q.  Were you one of the many who had New Year's Eve duty?

16   A.  Not -- no.  I worked, but not by the ball.

17   Q.  My name is Kelley Sharkey.

18   A.  Nice to meet you.

19   Q.  Officer, you testified on direct examination that at

20   approximately 11:50 on August 9th, you heard shots as you were

21   traveling southbound on Broadway, right?

22   A.  No, I didn't hear the shots.  It came over the radio that

23   there were shots fired.

24   Q.  Okay.  And how long did it take you to get to 139th from

25   when you first heard that run?

1   A.  I'm not sure.  I wasn't paying attention to the time.

2   Q.  Well, how quickly, in retrospect?

3   A.  Probably about five minutes.

4   Q.  It took you five minutes to get to 139th from where you

5   were?

6   A.  Yes.

7   Q.  Okay.  Now, where were you when you first heard that shots

8   were fired?

9   A.  We were already going southbound on Broadway by West 145

10  Street.

11  Q.  Okay.  Now, there were a lot of calls put over concerning

12  this event, correct?

13  A.  Yes.

14          MS. SHARKEY:  And, Judge, with the government's

15  consent and stipulation, I'd like to enter into evidence at

16  this point a copy of the radio runs that night.

17          MR. DAVIS:  Can we note for the record what the

18  stipulation is as to this document?

19          MS. SHARKEY:  The stipulation is that it's a business

20  record kept in the normal course of business, made close in

21  time to the event, and the government and I have discussed this

22  and they agree to that stipulation.  And I'd like to hand it to

23  the witness to ask my further questions.

24          THE COURT:  All right.  Do you have a copy for the

25  Court?

1          MS. SHARKEY:  I do.

2          MR. DAVIS:  And, Judge, may I clarify the stipulation?

3    This is a business record kept by NYPD.  It's a record of --

4    it's maintained by 911 operators on the night in question.

5          MS. SHARKEY:  Agreed.

6          THE COURT:  Okay.  What are you marking this as?

7          MS. SHARKEY:  Defense Exhibit, I think it's B.  I

8    think had previously marked something but didn't enter it into

9    evidence; is that right?

10         THE COURT:  All right, received.

11         MS. SHARKEY:  Thank you, Judge.

12         (Defendant's Exhibit B received in evidence)

13   BY MS. SHARKEY:

14   Q.  Detective, I'm handing you a copy of the sprint report

15   concerning this event maintained by 911, and I'm just going to

16   ask you to look at it for a second, and then I have some

17   questions for you.

18         (Pause)

19         Did you have a chance to look at that, sir?

20   A.  Yes.

21   Q.  So prior to that brief interruption, I had asked you about

22   the traffic on the radio run, right?

23   A.  Yes.

24   Q.  And there were a number of descriptions of the shooters put

25   over the airwaves, correct?

1   A.  Yes.

2   Q.  And with the Court's permission, you can refresh your

3   recollection and look at that document, but would it be

4   accurate to say that one description was a perp male wearing a

5   white shirt and a second male wearing a red shirt?

6          MR. DAVIS:  Objection, your Honor.  I would just ask

7   that counsel clarify whether she is asking whether Officer

8   Thomas remembers this at the time that he was -- on August 9th,

9   or now having looked at the defense exhibit.

10          MS. SHARKEY:  Sure, I have no objection to that.

11          THE COURT:  All right.  Well, first of all, the

12   exhibit is in evidence; so, therefore, you can point him to

13   something specific and then ask him, does that refresh your

14   recollection of X, Y or Z.

15          MS. SHARKEY:  Okay.

16   BY MS. SHARKEY:

17   Q.  Officer, I'd ask that you look at Defense Exhibit B and

18   look at 8-9-2018, 234507.

19   A.  Okay.

20   Q.  2345, I'm sorry, 42.

21   A.  42?

22   Q.  Yes, sir.  Good?

23   A.  Yes.

24   Q.  Does that refresh your recollection that you heard that a

25   female caller saw the Police Department going the other way and

1    that the perps just ran inside a building across the street

2    from 626 Riverside?

3    A.  I don't remember that.

4    Q.  Do you remember -- directing your attention to the next

5    line -- that two descriptions of the perps were a perp male

6    wearing a white shirt and a perp male wearing a red shirt?

7    A.  I do not remember that.

8    Q.  Okay.  Do you remember -- going down to line 234649 -- that

9    you were looking for two males wearing masks?

10   A.  I do not remember that either.

11   Q.  And, Officer, going down to line 234929, do you remember

12   that there was a radio run put out that the perps ran in a

13   building on the corner of Riverside across the street from

14   building 626?

15   A.  I do not remember that either.

16   Q.  Okay.  Now, you testified on direct examination, sir, that

17   you searched Mr. Pena when he was in custody, correct?

18   A.  Yes.

19   Q.  And you testified on direct examination that you arrived on

20   the scene as Mr. Pena was being searched; is that correct -- or

21   being cuffed; is that correct?

22   A.  Being cuffed.

23   Q.  Did you see Mr. Pena walking, with his hands up, towards

24   the police officers?

25   A.  No, I did not.

1   Q.  And so the first thing you saw was Mr. Pena bent over a

2   hood of a car being cuffed by a fellow officer, correct?

3   A.  I believe so, yes.

4   Q.  Now, you testified on direct examination, sir, that when

5   you searched -- withdrawn.

6       When did you first search Mr. Pena?

7   A.  When we were able to get the second cuff onto his arm -- or

8   his hand.

9   Q.  And how long was that after your arrival on scene?

10  A.  Say that one more time?

11  Q.  How long after that was your arrival on scene?

12  A.  After I cuffed him, or after the search?

13  Q.  How much time elapsed from the time you arrived on scene to

14  the time you searched Mr. Pena?

15  A.  It couldn't have been more than five minutes.

16  Q.  And Mr. Pena was cuffed for the entire time that he was at

17  the location, correct?

18  A.  Yes.

19  Q.  And he was cuffed when he was inside the RMP on his way to

20  the precinct, right?

21  A.  Yes.

22  Q.  Now, you testified on direct that you took a wallet, a cell

23  phone, some money and also a sock from his left pocket,

24  correct?

25  A.  Yes.

1    Q.  Now, sir, you were -- you met with the prosecutors in this

2    case, prior to testifying, on a couple of occasions before

3    today, correct?

4    A.  Yes.

5    Q.  And they asked you questions and showed you video about the

6    events that night, correct?

7    A.  Yes.

8    Q.  And isn't it accurate to say that you told the prosecutors

9    and Detective Santiago -- and I mean AUSA Davis and AUSA

10   Comey -- on December 5th, 2018, that when you first searched

11   his pockets, you only found money and a wallet?  Isn't that

12   correct?

13   A.  It's possible, yes.

14   Q.  Let me show you a copy of something, and it's 350603, and

15   it is the --

16              MS. SHARKEY:  I don't have a second copy, Judge.  I'm

17   reference --

18              THE COURT:  Yes, I have it.

19              MS. SHARKEY:  350603, page 2, line -- the second

20   paragraph, which I have highlighted.  May I approach the

21   witness?

22              THE COURT:  Yes.

23   BY MS. SHARKEY:

24   Q.  Sir, read these five lines.

25   A.  The ones that's highlighted?

 1   Q.  Yes.

 2   A.  Helped detain --

 3   Q.  No, no, no.  Read to yourself.

 4   A.  Oh, I'm sorry.

 5   Q.  That's okay.

 6           (Pause)

 7   A.  I'm sorry, it's hard to read the handwriting.

 8   Q.  I agree.  It's AUSA Davis' handwriting.

 9           THE COURT:  That's a federal offense, isn't it?

10           MS. SHARKEY:  I think so.  I think it's obstruction of

11   justice.

12           (Pause)

13   Q.  Okay?

14   A.  Yes.

15   Q.  So isn't it accurate to say that on December 5th, 2019 --

16           THE COURT:  No, no, no.  December 5th, 2019?  Not yet.

17           MS. SHARKEY:  Thank you, Judge.

18           THE COURT:  This hearing has gone on long enough.

19   Q.  December 5th, 2018, you told the two prosecutors present

20   and the detective that when you first searched Mr. Pena, you

21   only found money and a wallet in his pockets; isn't that

22   correct?

23   A.  Yes.

24   Q.  And, Officer, you testified on direct examination that you

25   turned your body cam on after Mr. Pena was cuffed or before?

J14PPENH                    Thomas - Cross

1  A.  After.

2  Q.  Now, you testified that you were only using the body cam

3  for about two weeks or a month, right?

4  A.  Yes.

5  Q.  But prior to your using the body cam, you were trained on

6  the body cam, right?

7  A.  Yes, I was.

8  Q.  And you were trained on how you should wear the body cam

9  and when you should turn the body cam on, right?

10  A.  Yes.

11  Q.  And that was by the training division of the NYPD, correct?

12  A.  Yes.

13  Q.  And did that training occur at the academy or in the

14  precinct?

15  A.  At the academy.

16  Q.  And how many days was that training?

17  A.  It was either one or two days; I'm not too sure.

18  Q.  And you were directed to turn the body cam on immediately

19  when you were responding to an event; isn't that correct?

20  A.  Yes.

21  Q.  And that was fresh in your mind at the time that you were

22  working on August 9th, 2018, right?

23  A.  Yes.

24  Q.  But you did not turn the body cam on, did you?

25  A.  No, I did not.

1    Q.  And when you were questioned by the government concerning

2    the body cam that you were wearing, sir, you had been on the

3    scene, with Mr. Pena cuffed, for about a half hour at the time

4    that video was started, right?

5    A.  Yes.

6    Q.  And from the time you arrived at the scene until the time

7    Mr. Pena was taken away in an RMP was about 50 minutes, right?

8    A.  Yes.

9    Q.  And Mr. Pena was cuffed the entire time, correct?

10   A.  Yes.

11   Q.  You had your hand on Mr. Pena the entire time, correct?

12   A.  Yes.

13   Q.  And when you first arrived at the location, some officers

14   had their guns drawn, correct?

15   A.  No.

16   Q.  You didn't see anybody with their guns drawn?

17   A.  No, I did not.

18   Q.  You didn't see Mr. Pena walk down towards the officer that

19   you assisted in putting the cuffs on, correct?

20   A.  No, I did not.

21   Q.  Okay.  Now, when you saw Mr. Pena, he was wearing a black

22   Jersey with bright yellow or gold Pirates lettering, correct?

23   A.  Yes.

24   Q.  And also, Mr. Pena had sneakers on, correct?

25   A.  Yes.

J14PPENH                        Thomas - Cross

1   Q.  And those sneakers were black with white stripes, correct?

2   A.  That, I'm not sure of.

3   Q.  Well, you spoke with Police Officer Carlstrom about this

4   event, right?

5   A.  Police Officer Castro?

6   Q.  Detective Carlstrom, sorry.

7   A.  I believe so.  I'm not too sure.

8   Q.  3506-02, the bottom paragraph.

9           MS. SHARKEY:  May I approach the witness, your Honor?

10          THE COURT:  Yes.

11  Q.  I'm going to show you a copy of a document, and I'm going

12  to ask that you read the bottom four lines -- it's highlighted,

13  and there are a couple of red stars next to it -- and see if

14  that portion of that document refreshes your recollection as to

15  what you told Detective Carlstrom concerning what Mr. Pena was

16  wearing.

17          (Pause)

18  A.  Yeah, I remember the first part.

19  Q.  My question is this.  Didn't you tell Detective Carlstrom

20  that Mr. Pena was not wearing a hoody or do-rag?

21  A.  Yes.

22  Q.  And didn't you tell Detective Carlstrom that he was wearing

23  jean shorts with black sneakers with white markings?

24  A.  Yes.

25          MS. SHARKEY:  Just one second, Judge.

1                THE COURT:  Yes.

2   Q.  And, sir, didn't you also tell -- well, withdrawn.

3                You testified on direct examination that when you did

4   this second search of Mr. Pena, 50 minutes after he was

5   detained and arrested and handcuffed, you recovered a piece of

6   tissue from his waistband?

7   A.  Yes.

8   Q.  Now, on December 5th, 2018, didn't you tell Detective

9   Santiago, Mr. Davis and Ms. Comey, that you found the bag of

10  coke and a round on him, in his sock, in his underwear

11  waistband prior to him getting into the RMP?  Do you remember

12  that?

13  A.  Yes.

14               MS. SHARKEY:  I have nothing further.

15               THE COURT:  All right.  Any other cross-examination?

16               MR. JOYCE:  Just a couple of questions, your Honor.

17  CROSS-EXAMINATION

18  BY MR. JOYCE:

19  Q.  Sir, at the time that you were at the location at 135th and

20  12th Avenue, you were paying attention to the man with the

21  black shirt and the gold letters, right?

22  A.  Yes.

23  Q.  But there was another individual who was in custody as

24  well, right?

25  A.  Yes.

J14PPENH                          Thomas - Redirect

1    Q.  And you knew where that person was located, right?

2    A.  Yes.

3    Q.  And that person was located with some police officers in a

4    different location from where you were standing, and he was

5    still there when you put the man with the black shirt into the

6    police car, correct?

7    A.  I believe so.

8    Q.  And just so we're sure -- clear about -- when you arrived

9    at 135th and 12th Avenue, there was approximately ten or 12

10   police cars there, correct?

11   A.  When I arrived?  No.

12   Q.  Before you left, were there ten or 12 police cars there?

13   A.  There could have been; I didn't really count.

14   Q.  And at some point, there were about 10 or 15 uniformed

15   police officers in that location, correct?

16   A.  Yes.

17              MR. JOYCE:  I have nothing else.

18              THE COURT:  Okay.  Redirect?

19              MR. DAVIS:  May I have a moment, your Honor?

20              THE COURT:  Yes.

21          (Pause)

22   REDIRECT EXAMINATION

23   BY MR. DAVIS:

24   Q.  Officer Thomas, do you still have a copy of Exhibit B in

25   front of you, Defense Exhibit B?

1    A.  Yes.

2    Q.  Do you recall being asked about defense Exhibit B on

3    cross-examination?

4    A.  Yes.

5    Q.  Okay.  Before today, have you ever seen Defense Exhibit B?

6    A.  No, I have not.

7    Q.  Did you see Defense Exhibit B on the night of August 9th,

8    2018?

9    A.  No, I did not.

10   Q.  Okay.  Do you remember, on cross-examination, defense

11   counsel was asking you about your conversations with the

12   government and meetings with the government?

13   A.  Yes.

14   Q.  Do you recall being asked about your description of when

15   you recovered the sock from Mr. Pena?

16   A.  Yes.

17   Q.  Did you recall what, if anything, refreshed your

18   recollection about your memory about when you recovered the

19   sock from Mr. Pena?

20           MS. SHARKEY:  Objection as to form.

21           THE COURT:  Overruled.

22   A.  I can continue?

23   Q.  Yes, you can.

24   A.  Yes.  My body cam video that was on, also a statement that

25   I had written out, handwritten out, after everything went down,

J14PPENH

1   and I had got back to the precinct.

2           MR. DAVIS:  May I have a moment, your Honor?

3           (Pause)

4   Q.  So Officer Thomas, you mentioned a statement that you

5   wrote.  When exactly did you write that statement?

6   A.  Immediately after I got back to the precinct, after

7   Mr. Pena was already taken away.

8   Q.  And when did that occur, was it after -- sorry.  When

9   exactly did you write that statement?

10  A.  Immediately when I got to the precinct.

11  Q.  And what did that statement describe?

12  A.  It described everything that I partaked in of that event.

13          MR. DAVIS:  No further questions at this time, Judge.

14          THE COURT:  Anything else?

15          MS. SHARKEY:  No.

16          MR. JOYCE:  No, your Honor.

17          THE COURT:  Very good.  Thank you so much.  You may

18  step down.

19          (Witness excused)

20          THE COURT:  Does the government rest?

21          MR. DAVIS:  The government rests, your Honor.

22          THE COURT:  How about the defense?

23          MR. JOYCE:  Defense for Mr. Hilario arrests.

24          MS. SHARKEY:  Defense for Mr. Pena rests.

25          THE COURT:  Very good.  All right.  I'm going to take

J14PPENH

1   two very short matters that will take about ten minutes.  So we

2   will resume with summations starting about ten after the hour.

3   See you then.

4              MR. DAVIS:  Thank you, your Honor.

5              (Recess)

6              (Hearing resumed; in open court)

7              THE COURT:  Please be seated.  All right.  Let's hear

8   first from the government.

9              MR. DAVIS:  Thank you, your Honor.  Would you prefer

10  that I address the Court from the podium or from here?

11             THE COURT:  Whichever is your preference.

12             MR. DAVIS:  Thank you.  Mr. Pena and Mr. Hilario were

13  arrested because of excellent police work by the NYPD.  At each

14  stage of this investigation, the NYPD did exactly what the law

15  requires and exactly what a dangerous situation demanded.

16             The defendants' motion should be denied because the

17  officers had probable cause to arrest Mr. Pena and Mr. Hilario

18  at the moment they were stopped at 135th and 12th Avenue.

19  Officer Doheny reported over the radio that suspect's direction

20  of flight that he saw running from the scene of the shooting.

21  He also reported an article of clothing that matched the

22  description of the suspects.

23             Officer Smith heard those reports over the radio and

24  saw, when he arrived at 135th and 12th, the suspects running in

25  the exact direction of flight reported over the radio and

J14PPENH

1    wearing black clothing, which was reported over the radio as

2    well.  But the Court does not even need to reach the question

3    of whether probable cause existed at the time that Mr. Pena and

4    Mr. Hilario were initially detained to deny defendants'

5    motions.  That's because there was, at a minimum, reasonable

6    suspicion to stop Mr. Pena and Mr. Hilario at that initial

7    stop, when they were first detained while the investigation

8    continued.

9              And we know that the investigation did continue.

10   Twenty minutes after Mr. Pena and Mr. Hilario were first

11   detained, we heard the testimony that Lieutenant Reed viewed

12   the video of the shooting and the robbery.  On that video,

13   Lieutenant Reed saw the suspects committing the crime, and then

14   ten minutes after that, Lieutenant Reed showed up at 135th and

15   12th and saw the suspects and identified them as the

16   perpetrators.

17             So whether the Court analyzes this arrest as a

18   probable cause arrest made at the time that the defendants were

19   initially stopped or as a Terry stop, followed by a lawful

20   arrest on probable cause, defendants' motion to suppress the

21   evidence seized from them should be denied.

22             I want to structure my argument today in three parts.

23   I want to first address the probable cause framework for

24   defense motions.  I then want to address the Terry stop

25   framework for defendants' motions, and in each section I want

J14PPENH

1    to address the particular items that the defendants seek to

2    suppress.  And then, finally, I want to address, as to

3    Mr. Hilario, the spontaneous statement he made while he was

4    being detained and the post-arrest statement he made after his

5    formal arrest.

6         Turning first, your Honor, to probable cause.  The

7    officers had probable cause to arrest the defendants the moment

8    they were stopped.  Probable cause exists when officers have

9    knowledge of facts and circumstances that warrant a person of

10   reasonable caution to believe that an offense has been

11   committed by the person to be arrested.  This is a richly

12   factual inquiry, and here there are a number of facts and

13   circumstances that support probable cause.

14        I want to highlight for the Court eight of those facts

15   and circumstances that provided probable cause at the instant

16   that Mr. Hilario and Mr. Pena were first detained.  First, we

17   have the officers putting out over the radio that shots were

18   fired.  This was a shots fired call.

19        Second, we have the officers putting out over the

20   radio a location of that shots fired call.  The shots fired

21   occurred at 139th and Broadway.

22        Third, we hear Officer Doheny, he testified that he

23   saw a man in a black shirt and a muzzle flash fire the shots,

24   and he testified that he then chased those suspects as they ran

25   westbound on West 139th.  And what Officer Doheny put over the

J14PPENH

1    radio was the direction of flight.  He first said Riverside

2    Central, Riverside.  So now we know where the shots were fired

3    and now we know the direction of flight, Riverside Central,

4    Riverside.

5          But Officer Doheny gets even more specific than that

6    because after he says Riverside Central, Riverside, he said:

7    They're running towards 12th; they're running towards 12th.

8    Now, embedded in that communication are three important facts

9    about the suspects.  First, Officer Doheny said "they're,"

10   meaning there's more than one.  Second, he said "running."

11   That's a mode of transportation.  Third, he said "they're

12   running towards 12th"; so now we have a further direction of

13   flight.  You can trace it from 139th and Broadway to Riverside

14   to 12th.

15         But Officer Doheny continues.  He says "black shirt,

16   running down 138th;" so now we know even more about the

17   suspects.  Their direction of flight is even more exact because

18   we know 138th is south of 139th; so they're running from 139th

19   and Broadway to Riverside to 12th, now south.  And we know that

20   there's a black shirt involved, that one of the suspects is

21   wearing a black shirt.

22         Finally, the last description of the direction of

23   flight that Officer Doheny puts out over the radio is he says

24   he ran down 12th.  So now we know that the suspects are running

25   down 12th.  And so finally, now we hear the other end of this.

J14PPENH

1    So Officer Doheny is putting this out over the radio.

2              Who hears this?  Officer Smith hears it, and Officer

3    Smith testifies that he heard these transmissions about the

4    direction of flight of the suspects, and he went to where?  To

5    135th and 12th.  And he testified exactly why he went to 135th

6    and 12th.  He says he went there because of the direction of

7    flight that the officer put over the radio and because that

8    location might be a route that any suspect might potentially

9    flee.

10             So Officer Smith hears that information, goes to where

11   he thinks the suspects are running based on not only Officer

12   Doheny's exact direction of flight provided, but also his

13   experience as a police officer.  And what does he see next?

14   Within three minutes of the shots fired call, Officers Smith

15   sees two suspects running down 12th Avenue towards 135th and

16   12th and wearing dark clothing, black shirts.  Officer Smith

17   saw these suspects running exactly where he would expect

18   someone to run when they were fleeing.

19             And so, your Honor, considering all of these facts

20   together, that these suspects were running in the middle of the

21   night on August 9th, in the exact direction of flight put out

22   over the radio, three minutes after the shots were fired and

23   matching the articles of description of the clothing, a person

24   of reasonable caution would have thought that a crime had just

25   been committed by these suspects.  And that conclusion that

J14PPENH

1   probable cause existed at that moment is dispositive as to the

2   defendants' motions to suppress any physical evidence found on

3   him.

4          That's because as to the clothing that they were

5   wearing, that was properly seized either incident to arrest or

6   as part of an inventory search.  And as to the items found on

7   Mr. Pena's person, those were seized proper to an incident to

8   an arrest based on probable cause.

9          But, your Honor, importantly, you don't have to reach

10  the question of whether probable cause existed at the time of

11  the arrests, at the time of the initial detention to deny

12  defendants' motion to suppress the physical evidence.  That's

13  because all of those facts and circumstances that we just

14  covered certainly surpass the minimal bar required for a Terry

15  stop.  They provided the reasonable suspicion that crime was

16  afoot, and that allowed the officers to stop the defendants, to

17  stop Mr. Hilario and Mr. Pena, while the investigation

18  continued.

19         And that investigation did continue.  Twenty minutes

20  later Lieutenant Reed viewed a surveillance video of the

21  shooting itself, and he was able to put out over the radio a

22  description of Mr. Pena.  And after that, ten minutes after

23  that, Lieutenant Reed showed up at 135th and 12th and

24  identified the suspects.

25         So once we're in a Terry stop framework, your Honor, I

J14PPENH

1    think the question becomes -- and this is, again, in the

2    alternative -- the question becomes kind of timing.  When did

3    the Terry stop, if at all, mature into a formal arrest, versus

4    when the did the police have probable cause to effect that

5    arrest?

6         And what's good about the record here is that we can

7    put times on this.  We can put times on it because we can start

8    with the transcripts in Government Exhibit 101.  We hear at

9    three minutes and 20 seconds into that transcript, Officer

10   Smith says he has one male stopped.  Then we hear over the

11   radio, 22 minutes and 50 seconds into that transcript,

12   Lieutenant Reed put out a description of Mr. Pena when -- of

13   the clothing that he was wearing.

14        And we heard Lieutenant Reed testify that when he was

15   making that radio communication about that description, he was

16   watching the surveillance video.  So that means from the time

17   of the initial stop to the time where Lieutenant Reed is

18   watching the video of the suspects committing the crime, it was

19   less than 20 minutes there.

20        But we can go one step further than that by looking at

21   Officer Smith's body cam.  At the beginning of Officer Smith's

22   body cam, which is Government Exhibit 301, we see Officer Smith

23   having detained Mr. Hilario and in the process of detaining

24   Mr. Pena.  About 20 minutes into that, at 1958, we hear, over

25   the radio, Lieutenant Reed give the description of Mr. Pena

J14PPENH

1     that we were just discussing.

2            Ten minutes after that, at 33 minutes and 45 seconds

3     in Government Exhibit 301, we see Lieutenant Reed for the first

4     time at 135th and 12th.  So that means from the start of the

5     stop, which is at zero, the beginning of Government

6     Exhibit 301, to when Lieutenant Reed has done a show-up, after

7     having watched the video, we have a 33-minute stop.  So this is

8     a 33-minute investigative detention.

9            I bring up this timing not because -- to set up the

10    framework for the discussion, but the legal inquiry before the

11    Court, when addressing whether time alone can turn a Terry stop

12    into arrest, isn't a bright-line rule.  It's not whether it was

13    20 minutes or 30 minutes or 40 minutes or 50 minutes.  Instead,

14    the Court asks whether the police were diligently pursuing

15    their investigation during the stop.  And on this record, where

16    we have Lieutenant Reed watching a video of the suspects

17    committing the crime during -- within 20 minutes of the initial

18    detention, and then doing a show-up to identify the suspect ten

19    minutes later, I don't think there can be an argument this

20    wasn't a reasonably diligent search by the police and

21    investigation by the police.

22            And one other thing to go to get folded into the

23    probable cause discussion is when Lieutenant -- for Lieutenant

24    Reed, is all the direction of flight, all the Officer Smith

25    testimony and Officer Doheny testimony, that all gets folded

J14PPENH

into the probable cause determination that Lieutenant Reed is
making, as well as the articles of clothing that Lieutenant
Reed viewed when he first arrived at 135th and 12th.  He saw a
do-rag and a black hooded sweatshirt that were on the path of
flight.

          So I would anticipate that the defense counsel would
also argue that this matured into an arrest.  If we're in the
Terry stop framework, again, we're in the alternative, but if
we're there, I would anticipate that the defense counsel will
argue that the use of restraints and the number of police
officers matured this Terry stop into an arrest before probable
cause existed.

          And on this record, we don't think that has any merit.
As an initial matter, the Second Circuit has repeatedly held
that the use of restraints is permitted and doesn't turn a
Terry stop into an arrest when there is a response to
legitimate safety concerns on parts of the investigating
officers, and they've also found restraints to be permissible
when there is a risk of flight.

          Here, your Honor, we have demonstrable evidence of
both.  This is a shots fired call.  This wasn't a Terry stop
that had nothing to do with a dangerous situation.  This was a
response to a shots fired on a public street in the middle of
the night.  So there was immediate danger to society and
immediate concern about the suspects being armed.

1              And even further still, Lieutenant Reed testified that

2     the police officers were looking, continuing to look for

3     another firearm while the suspects were being detained.  Now,

4     that's important because it speaks to the danger of having the

5     suspects unrestrained during the time of the investigative

6     stop.

7              And we can go one step further than this, your Honor.

8     Officer Smith testified that after the defendants were placed

9     in the RMP and the decision to arrest them has been made and

10    they were taken away, it was only after that that Officer Smith

11    found the second firearm, which was found along the path of

12    flight of the suspects.  And that's important because if they

13    were -- it shows how dangerous this situation was.  Imagine if

14    the defendants were not restrained?

15             What I'll say is, the Second Circuit has been clear in

16    a number of cases that it doesn't ask -- it doesn't second

17    guess police officers' reasonable use of restraints, and

18    there's a good reason for that.  I mean, here, it's probably

19    very easy to point, look back at this situation where the

20    police did everything correctly and the arrested were effected

21    safely and efficiently and to say, it would have been fine if

22    the defendants weren't restrained.

23             But there was a serious risk of danger here because

24    there was a firearm along the path of flight that the officers

25    hadn't discovered yet, while they were being investigated.  So

1    this situation could have escalated into a dangerous one

2    quickly.

3              But even further, your Honor, not only did we have the

4    risk of danger and weapons associated to allow restraints to be

5    used during the Terry stop, we also had a demonstrable risk of

6    flight because the two suspects were detained fleeing from the

7    scene.  They were running.  That's Officer Doheny's testimony.

8    That's Officer Smith's testimony, and that, in itself, would

9    justify the restraints because what's the alternative?  The

10   alternative is to hold the defendants at gunpoint unrestrained,

11   and that's just not reasonable police conduct.

12             So, your Honor, we don't think that either of those

13   factors could turn this into an arrest before probable cause.

14             And last point on this is just the number of police

15   officers.  Again, Lieutenant Reed testified that there was

16   still an ongoing search for a firearm, and whether this -- how

17   many number of police officers were there doesn't turn this

18   into an arrest because it was reasonable, under the

19   circumstances, to have police officers present at the scene

20   responding to a shooting on a public street in the midst of the

21   search for a second gun.

22             So now that we've established the Terry stop

23   framework, I want to discuss how this framework applies to each

24   of the items that the defendants seek to suppress.

25             So as to Mr. Hilario, Mr. Hilario is seeking to

suppress his clothing.  Well, that was seized after probable

cause was established, at the latest, and so that comes in

incident to arrest, or as part of an inventory search.

        As to Mr. Pena, who had items in addition to his

clothing, which the same analysis applies, but in addition to

his clothing, there was crack cocaine found on him.  That

was -- Officer Thomas testified that that was found during a

second search, after Lieutenant Reed had decided that they were

going back to the precinct.  So Lieutenant Reed had probable

cause for the arrest at that point.  That comes in incident to

the arrest.

        Then Officer Thomas said there was an initial search

that he did when he initially arrived at the scene.  Even

putting aside that there was probable cause at that time to

arrest them, just assuming for a second we're in the Terry stop

framework, as to those items, they all come in, and this

includes the sock with the bullet.  It all comes in as

inevitable discovery, your Honor, because it's clear that the

arrest -- the later arrest was valid and likely to occur.

        It's actually not likely to occur.  We know it would

have occurred because we know the items that were seized from

Mr. Pena initially, including the sock, wouldn't have anything

to do with the probable cause determination to arrest Mr. Pena.

It's only after that decision to arrest was made that Officer

Thomas discovers the bullet in the sock.  So we actually know

J14PPENH

1    this is an incredible strong case for inevitable discovery if

2    we're in this framework as to the sock.

3         Your Honor, in my final part of my argument, I want to

4    address Mr. Hilario's statements and the Miranda issue.  I want

5    to first address Mr. Hilario's statements that he made while

6    being detained on 135th and 12th, and I want to be clear about

7    what the government is seeking to introduce.

8         The government is seeking to introduce the spontaneous

9    statement that Mr. Hilario made.  He says:  "Can you hand me my

10   money?  It's over there, on top of your car."  That's at

11   Government Exhibit 301, at time stamp 23:50:10 through

12   23:50:14, and that statement is not in response to any

13   questioning by Officer Smith.  It's a purely spontaneous

14   statement.

15        In fact, Officer Smith and other officers had been

16   telling Mr. Hilario to stop talking before he made that

17   statement.  And so any argument that there is a Miranda problem

18   with that statement must fail because the statement wasn't made

19   in response to any interrogation, any questioning.

20        And finally, after the post-arrest interview, my

21   understanding is that defense is seeking to suppress that

22   interview on the basis of it being an improper arrest and

23   because, under either framework, the arrest was proper and

24   Mr. Hilario's Miranda waiver was knowing and voluntary, we

25   think that motion should fail as well.

J14PPENH

1          May I have a moment, your Honor?

2          THE COURT:  Yes.

3          (Pause)

4          MR. DAVIS:  Just stepping back, your Honor, this is --

5     the police in this case did exactly what we would want them to

6     do.  They responded to a dangerous situation in three minutes,

7     have the suspects who committed the crime under -- in custody

8     and found the second firearm, and with that, I'll save my time

9     for rebuttal.

10         THE COURT:  Thank you very much.  Who wants to go

11    first?

12         MS. SHARKEY:  I'm going to start, Judge.

13         THE COURT:  Okay.

14         MS. SHARKEY:  Your Honor, it's our position that the

15    evidence recovered from Mr. Pena violated constitutional norms

16    and should be suppressed.  There was either -- there was

17    neither probable cause to arrest.  I agree that the government

18    may have been -- or the police may have been allowed to detain

19    Mr. Pena for a brief period of time, maybe.  But that initial

20    detention ripened into an arrest, and the items recovered from

21    him should be suppressed.

22         More specifically, your Honor, I'd like to go back and

23    start with Police Officer Doheny.  Police Officer Doheny was

24    the initial police officer.  He jumped out of the car, he did

25    the chase.  He described the shooter as a man with a black

1   shirt.  He didn't see his face, and he gave no description of a

2   do-rag.  And he saw him running towards Riverside Drive, and he

3   saw him run into the park.

4           Repeatedly, three different times, at page 11, at page

5   12, at page 19 in the record, Police Officer Doheny said that

6   he lost sight of the shooter at that point.  Now, that was an

7   extremely chaotic scene.  We know from reviewing the

8   exhibits -- Judge, can I have one second?  I need the exhibit

9   list.  I'm sorry.

10          (Pause)

11          Judge, we know from the exhibits that were entered

12  into evidence by the government, surveillance video 1 and 2,

13  Exhibits 401 and 402, that there were two shooters at the scene

14  and that shots were flying in multiple directions.

15  Additionally, persons were running in multiple directions, and

16  that came directly from the testimony of Lieutenant Reed.

17          We also know from Defense Exhibit A that there were

18  numerous calls made in to 911 concerning the description of the

19  individuals.  And what in actuality happened on 139th, and I'll

20  just point the Court to a couple of things.  One call was that

21  they were running north on 139th, running towards 12th.  That

22  coincides with what Detective Doheny said.  A female caller

23  stated that she saw the PD going the other way and that the

24  perp just ran into a building across the street.

25          Other callers said the perp was wearing a white shirt,

J14PPENH

1   the perp was wearing a red shirt.  They were looking for two

2   males wearing masks.  Another caller again said later on that

3   they ran into the building on the corner of Riverside across

4   from the location.  So I think that does raise the question as

5   which shooter was Police Officer Doheny chasing.

6          It was so chaotic, your Honor, that Police Officer

7   Doheny ran into Riverside Park with his gun drawn and pointed

8   at two individuals, have them come out from the bushes and it,

9   in fact, gives a new meaning to the phrase "Get a room."

10         Now, when Police Officer Doheny arrived at the

11  location where Mr. Pena was detained at 135th Street, he didn't

12  make any identification.  He didn't go over and look at the

13  suspects to see if he could identify them, and there was no ID

14  by him.  I submit, your Honor, that the scene was more chaotic

15  than the presentation in Court presented.

16         I think it should be troublesome to the Court that all

17  of these officers' body cams were not engaged.  Officer Doheny

18  testified that when he ran into Riverside Park, the body cam,

19  that was on the same string as his badge, which Mr. Joyce

20  elicited, fell to the ground, but his badge didn't fall to the

21  ground.  He testified later that he recovered the body cam, and

22  there was no damage.

23         I submit that the officers were not only derelict, but

24  they purposefully did not engage their body cams, and I'll get

25  to that in a moment.  I'm not saying it was prearranged, but

1    those officers were trained very soon on the use of the body

2    cams or very close in time to the use of the body cams at the

3    time of this incident, as we heard from this police officer

4    this morning.

5          You heard from Detective Smith that he told the

6    detective who was debriefing the police officers, Detective

7    Carlstrom, on that evening, that the gun was recovered on West

8    138th and 12th Avenue.  Police Officer Smith stated that the --

9    you know, that was close to 135th, and the blocks didn't come

10   down.  But, respectfully, that doesn't make any sense.  That's

11   almost a physical distance of the space of five blocks.

12         So defense's position, to put this in some sort of

13   context, is that there was no probable cause to arrest

14   Mr. Pena, and that if the Court is analyzing this under a Terry

15   analysis, that the investigatory stop morphed into an

16   impermissible stop and subsequent pat-down.

17         We know that when -- and you know this from the body

18   cam of Police Officer Smith that was played at the original

19   session in this hearing, that Mr. Pena -- you could observe

20   Mr. Pena walking towards the police officers with his hands

21   raised, in a black shirt with bright, bright lettering

22   concerning the Philadelphia Pirates --

23         MR. JOYCE:  Pittsburgh.

24         MS. SHARKEY:  -- Pittsburgh Pirates, forgive me.

25   More, Judge, the government has said that, you know, it was

J14PPENH

excellent police work, it's in conformity with constitutional

norms because Lieutenant Reed was able to broadcast a

description of the individuals within 20 minutes.  Well, not

so.  Because the broadcast by Lieutenant Reed did not match

what Mr. Pena was wearing.  The shirt was different, as were

the sneakers.  You know from the officer who testified this

morning, he says that the sneakers were black with white

stripes.  Lieutenant Reed made a big point that the sneakers

were -- he was sockless, they were black sneakers.

        Additionally, counsel for government, AUSA Davis,

stated that the black sweater that was recovered and the do-rag

were found along the path of the crime.  Well, that's not so.

If you review the transcript, at page 95, Lieutenant Reed was

asked the following -- page 95, line 3 -- question on direct

examination:

        What, if anything, was the significance of those

items, referencing the black sweater and the do-rag?

        Answer by Lieutenant Reed:  The black sweater with the

writing looked like what I saw on the video.

"Q.  And, Lieutenant Reed, to clarify, where were those items

located when you arrived at the scene?

"A.  They were on 138th Street, like on a sidewalk by a car."

        Now, that is similar, not identical, to the location

that Police Officer Smith said on the night of the incident the

gun was recovered from that location.  And, Judge, I would like

J14PPENH

1    to direct your attention to Government Exhibit 506.  Do you

2    have it, Judge?

3              THE COURT:  Yes.

4              MS. SHARKEY:  Okay.  506 depicts 12th Avenue and

5    also -- 12th Avenue going towards 135th, but also the path that

6    goes up to 138.  That path is not wide enough to accommodate a

7    car.  There's been no testimony that that path is wide enough

8    to accommodate a car.  A review of that path up to 138th

9    indicates or shows that it's not wide enough to accommodate a

10   car.

11             And I point that out because Lieutenant Reed had some

12   testimony concerning how he got from 139th to 135th, but at any

13   rate, Judge, the description on which the government is relying

14   as matching Pena, when he was detained for this long period of

15   time, didn't match the description of one of the shooters at

16   the scene.

17             Now, if the Court is analyzing this under the Terry

18   stop analysis, I'd like to point out that my client was in

19   custody, held, was handcuffed and held for 50 minutes prior to

20   being taken from the scene.  The government pegs it at 33

21   minutes.  I think a review of the original body cam by Officer

22   Smith shows that it's a longer period of time, but at any rate,

23   33 minutes as the context of this case defies constitutional

24   norms.

25             I know that your Honor is -- has great facility with

1    the law in this area, but the government's justifications for

2    their actions are not appropriate.  Our circuit has spoken on

3    whether or not having someone in cuffs for that period of time

4    is or is not appropriate.  *U.S. v. Fiseku*, 906 F.3d 65,

5    while -- it was a case before Judge Engelmayer, decided by the

6    circuit, while that endorsed the use of handcuffs on that

7    particular case, talks extensively about how handcuffs should

8    not be the norm and how handcuffs, in fact, are the --

9              THE COURT:  Give me the cite again.

10             MS. SHARKEY:  906 F.3d 65.

11             THE COURT:  Thank you.

12             MS. SHARKEY:  Thank you.  That handcuffs are, in fact,

13   the red light, the blinking light that, in fact, a detention

14   has evolved into an arrest.  Sister circuits, federal, is *U.S.*

15   *v Acosta-Colon*, 157 F.3d page 9; in our circuit at -- where

16   they utilize language of hallmark of an arrest is *U.S. v*

17   *Newton*, 369 F.3d page 676.

18             Now, Officer Thomas testified this morning concerning

19   the stop that he participated in, and his body camera was

20   turned on more than a half hour, I think it was 33 minutes on

21   the body cam, during his testimony, and you know that he

22   testified that after Mr. Pena was cuffed, there was a pat-down

23   within the first five minutes.  And on the 25th -- on the 5th

24   of December 2018, Officer Thomas told counsel for the

25   government that, in fact, on that initial pat-down he got a

1   wallet and money from the defendant's pocket.  And it wasn't

2   until the second time that he was patted down, after 50 minutes

3   or around 50 minutes, that he recovered from the defendant

4   drugs and a sock and a cartridge.

5           I submit, your Honor -- I have no objection to the

6   first pat-down.  I do object to the second body search, and I

7   do think that those items should be suppressed.  And I just

8   want to point out something to the Court, and I know you're

9   steeped in it, but even if you look at Exhibit 401, which is

10  one of the videos on 39th, I submit that that individual does

11  not look like my client.  That individual is much beefier,

12  larger, and I would just request that the Court take that into

13  consideration when deliberating.

14          Now, Judge, I've tried to cover the ground that I

15  think is relevant to the Court's decision, but do you have any

16  questions of me before I cede my time?

17          THE COURT:  No, that's very helpful, but you've

18  covered all the areas that I had questions about; so....

19          MS. SHARKEY:  Thank you, your Honor.

20          THE COURT:  Good.  We'll hear from counsel for

21  Mr. Hilario.

22          MS. SHARKEY:  Oh, I had one other thing.  I wish to

23  adopt any arguments Mr. Joyce raises that I have neglected to

24  raise.

25          THE COURT:  Are you sure you want to go out on a limb

1    and do that?

2              MS. SHARKEY:  Oh, I'm totally sure, Judge.

3              MR. JOYCE:  And I do the same.

4              THE COURT:  Very good.

5              MR. JOYCE:  Your Honor, there's an old phrase among

6    defense attorneys that says bad facts make bad law, and what's

7    meant by that is that when you have a situation where the

8    stakes get raised, sometimes certain judges or certain courts

9    seem to be blinded by that.  I know this is not the situation

10   in this courtroom, and we're very happy that we're here.

11             But the police on the street seem to think that as

12   well, because when they heard the phrase "shots fired," it's as

13   if the Constitution disappears.  And they didn't know who fired

14   the shots.  They didn't know which way the shots were, but the

15   police went into a mode, I suggest, your Honor, that said

16   anybody is going to get stopped.

17             And what we know about why motions to suppress are

18   suggested, what we know about the law or this area of the law

19   is that the police are supposed to understand that they can't

20   necessarily benefit from unconstitutional behavior.  Now,

21   under, I believe the case is Wong Sung, when the question is

22   whether or not someone is arrested, the question is whether a

23   reasonable, innocent person would believe they were under

24   arrest.

25             I think that that's a case which we can take into

consideration here because we have two people who were in the
bushes, who basically were handcuffed at gunpoint, totally
innocent people.  And so we do know that just about anybody in
that area was going to get stopped.

        The case which Ms. Sharkey cites, Fiseku, does a very
good job of putting out the four areas that the Court should
examine to determine whether or not a Terry stop has turned
into an arrest.  First is length of time; next, is it public or
private; third, the number of officers that are present;
fourth, the risk of danger; and fifth, the level of irons or
shackles or handcuffs.

        And the Court is instructed that they should look to
see what was the least intrusive manner in which the police
should have acted or could have acted during that period of
time of investigation.  In this case, Judge, the combination of
the little information they had about Richie Hilario and the
level of intrusion suggests that all of the evidence that was
obtained from him should be suppressed.

        What we know from Officer Smith is that he heard shots
fired, and he heard male, black.  Now, later on, he seemed to
think he heard other things, right?  But what he heard was --
I'm sorry, male, black shirt.  That's what he heard.  And he
thinks that there's two people involved because he heard the
word "they're."

        A tremendous amount is made about the direction of

J14PPENH

1   flight, but we know, because we've seen the map, there are many

2   directions of flight when someone goes into Riverside Park at

3   139th Street.  And, in fact, when Doheny lost sight, he didn't

4   know if the people went up 138th.  He didn't know if they went

5   another path.  He had lost sight.

6           So although Officer Smith took a hunch that they may

7   come at one location, that clearly wasn't the only location

8   that a person running down 139th Street could have ended up.

9   But when he sees a single individual, who's not wearing a black

10  shirt, running in his direction, he points his gun at him.  He

11  handcuffs him immediately, and he frisks him.  When he frisks

12  him, he finds no contraband.  Shortly thereafter, he sees

13  another man running, who doesn't have a black shirt on.  He had

14  a black shirt, but the gold letters are much more bright than

15  the black shirt, and he stops that individual also.

16          Now, Judge, the government says it's 33 minutes.  When

17  you look at whichever body cam it is that Officer Smith has on

18  him, I think it shows that it's much longer than 33 minutes

19  from the time that Mr. Hilario was stopped until he's told take

20  him in.  I think it's closer to 45 or 50 minutes, but I will

21  agree that 33 is not enough, and here's the reason why.

22          Because when we hear from Detective Reed, what we hear

23  what he has done is he has decided that he could look at some

24  video -- now, during the period of time, all of the different

25  descriptions that are coming ought, Officer Smith says, I don't

J14PPENH

know if I even heard any of them, but they are varied.  And as

Ms. Sharkey has said, people are going in different directions.

         But Officer Smith doesn't even know why he's holding

Richie Hilario.  He's told hold him, just hold him, just keep

holding him.  And on that radio run, there are a couple of

questions like:  Are we going to get a show-up?  Is anybody

going to come and ID this guy?  Right?  Because they know

that's the step that is supposed to take place and very, very

tellingly, Officer Doheny, who actually has seen the shooter

and maybe the two people running, he goes to the scene where

Mr. Hilario was handcuffed, and he's not identified as one of

the people who's running away.

         And they stay and they wait and they wait, and then

Lieutenant Reed then does his video review.  Tellingly about

the video review, your Honor, is this.  He never saw

Mr. Hilario commit a crime.  He was concentrating on the other

person mostly, but what he says is he saw the other person

pushing Mr. Hilario around.  And on direct examination, he made

it sound as though he saw Mr. Hilario take something from

someone's hand, but on cross-examination, at page 105, he

clearly says:  No, I didn't see that at first.

         And I would suggest that only came about at some point

later, but why Mr. Hilario was arrested is because he was

running away from a scene where a shooting was going on, and as

Lieutenant Reed said, he seemed to be pushed around by the

J14PPENH

1  shooter.  I suggest those are the reasons why he was arrested,

2  and we know that mere presence with another individual who's

3  committing some crime does not rise to the level of probable

4  cause; so an arrest would be improper.

5          Your Honor, as to the statements that occurred on the

6  street, clearly Mr. Hilario was detained.  He was in custody.

7  He was asked a number of questions about where he lived, and

8  there was conversations that were going on.  The government

9  says we only want to introduce the one statement about the

10 money, but there was a dialogue that was going on between the

11 officers and Mr. Hilario when there was not probable cause to

12 arrest him.  There wasn't reasonable suspicion at that time to

13 continue to detain him.  He was not read Miranda, and he was

14 continued to be asked questions.

15         As to the physical evidence, your Honor, the $120 was

16 never addressed by the police; so I would suggest that they

17 cannot introduce the $120 evidence at the trial because we had

18 put in issue the fact that $120 was taken from Mr. Hilario.

19 The evidence basically suggests no one knows where that $120

20 came from.  So I would suggest that the government hasn't met

21 its burden to prove that this -- that the seizure of that

22 evidence was lawful.

23         As to the statements back at the precinct, your Honor,

24 the illegal arrest that occurred on 135th and 12th Avenue is no

25 way attenuated because there's -- again, there's no facts in

J14PPENH

1    this record that would show what would occur that would say

2    Mr. Hilario had committed a crime between the time he was taken

3    to the precinct and the time that the statement was made.  And

4    so I think since there is no attenuation, therefore, the lack

5    of probable cause would suggest that that statement must also

6    be suppressed.

7              Finally, your Honor, the length of time was far too

8    long.  It was a public place where there were a number of

9    police officers.  And when you view the body cam from Officer

10   Smith, you'll see how many cars there were, how many officers

11   there were.  The risk of danger, Officer Smith said, he knew

12   after he had patted him down, that he was no longer in danger,

13   and yet, Mr. Hilario was handcuffed and there's an officer's

14   hand on his arm almost the entire either 33 or 50 minutes.

15             And finally, as we said, handcuffs were placed on him

16   immediately and never taken away.  In terms of a less-intrusive

17   means, they could have asked Mr. Hilario his address.  They

18   could have asked him his name.  They could have checked his

19   identification, and they could have released him.  And if their

20   investigation then revealed that he was a suspect, they could

21   have arrested him.  Thank you, your Honor.

22             THE COURT:  Thank you very much.  We'll hear finally

23   from the government on rebuttal.

24             MR. DAVIS:  Thank you, your Honor.  An initial

25   clarification point.  When the government was talking about the

33 minutes, what we were talking about is from the beginning of

Officer Smith's body cam to the point where Lieutenant Reed

first shows up at 135th and 12th.  So that's the timeline

that's important to the Court's analysis about when probable

cause -- the latest point when probable cause could have

existed to arrest the defendants.

After Lieutenant Reed has seen in the video, after

he's shown up and seen the clothes strewn on 12th Avenue and

viewed the suspects.  While I'm there, I want to talk about

Ms. Sharkey said the clothing wasn't found on the path of the

suspect.  On redirect, Lieutenant Reed clarified that it was

found on 12th Avenue, on that path.  That's at transcript at

112, lines 10 through 23, where Lieutenant Reed drew on the map

where he saw the clothing.

So let me go one by one on some of these arguments.

Ms. Sharkey mentioned Defense Exhibit B as providing a number

of alternative 911 calls.  There's no record of those calls

ever being heard by any of the officers who made the decision

to arrest.  Indeed, if you look at the time stamps on this

document, the first description we see that Ms. Sharkey pointed

to, begins at 23:45:07, and Officer Smith's body cam begins

with the time stamp of 23:44:06, which shows that those

descriptions happened after the stop at issue.  And that's

consistent with what we heard on Government Exhibit 101, which

was the dispatch that the officers were listening to the night

1    of the arrest and the transcript that they addressed.

2          So Ms. Sharkey and Mr. Joyce spoke about the other

3    stop that Mr. Doheny made en route when he was chasing the

4    suspects, and just quickly on that point, that point shows why

5    there's probable cause in this case as to Mr. Hilario and

6    Mr. Pena because, as to those suspects, Officer Doheny was

7    running in the middle of the night by himself, saw two suspects

8    wearing dark shirts, stopped them, and then realized they

9    weren't the suspects.  And why did he realize they weren't the

10   suspects?  Because they weren't running.  He saw their

11   footwear, and said they couldn't have been running.  That's not

12   them, and he let them go.  That's exactly what the police

13   should do in that situation.  Where it stands in great contrast

14   to the defendants who were running into the exact flight of

15   path down that 12th Avenue.

16         And Ms. Sharkey said that this was -- the officers

17   were somehow purposeful in not turning on their body cams.

18   That's an offensive suggestion.  There's no evidence in the

19   record of that.  These were officers responding to a shots

20   fired call.  Shots were fired on a public street on 139th and

21   Broadway.  They were trying to keep the community safe, and to

22   suggest that they were somehow deciding not to put on their

23   body cams as part of some conspiracy is offensive to the great

24   work that was done in this case.

25         I want to address briefly the case law that was cited

J14PPENH

1    about restraints, the *United States v. Fiseku* case, which was

2    decided a few weeks ago by the Second Circuit, I mean, this

3    case demonstrated exactly why restraints were appropriate,

4    appropriately used here.

5         In that case, the Court, as Ms. Sharkey said, held

6    that restraints were appropriate and didn't transform the Terry

7    stop into an arrest and noted that the Second Circuit has

8    repeatedly held that the government can point to circumstances

9    supporting a reasonable basis to think that even an unarmed

10   person could pose a physical threat or flight risk warrants

11   handcuffing.

12        And that, in this case, there was a risk of ongoing

13   and imminent criminal activity that heightened that one or more

14   of the suspects might be armed, and they might attempt to

15   flight or flee.  That's exactly our case, your Honor.  We have

16   evidence that the two defendants might have been armed.  There

17   was a gun nearby, and they had fled earlier in the night.

18   That's why they were stopped.

19        And I just want to note a couple other cases that were

20   cited knew, *United States v. Newton*, in the Second Circuit,

21   this is 369 F.3d 659, approved similar use of restraints during

22   a Terry stop.  And in that case, the Court specifically noted

23   that under the circumstances, handcuffing was a less

24   intimidating and less dangerous means of ensuring the safety of

25   everyone on the premises, than holding the defendant at

1    gunpoint during a search.

2            Again, the court is clear in Fiseku itself it says,

3    the court says we shouldn't be second guessing reasonable

4    police work.

5            And then there's the *United States v. Vargas*, which is

6    also in the Second Circuit, decided in 2004.  In that case, the

7    officers had reliable information that the suspect was carrying

8    a weapon, and he demonstrated his unwillingness to cooperate.

9    Again, restraint is appropriate.

10           Then there's *Grice v. McVeigh*, Second Circuit in 2017.

11   Officer received a report that an individual matching the

12   description had a remote control device, and handcuffing for 30

13   minutes was upheld.

14           And in Fiseku itself again, it was held that it was

15   fine.

16           So moving on from the legal points.  As to Officer

17   Thomas' testimony, which Ms. Sharkey spoke about, I would say

18   his testimony today is corroborated by his body cam.

19   Everything he said today is corroborated by what he's shown.

20   Your Honor saw Officer Thomas pull the crack cocaine from

21   Mr. Pena's waistband, placed it on the RMP.  Your Honor saw

22   Mr. Thomas return to the RMP after placing Mr. Pena in -- under

23   arrest and placing him in the car.  And he discovers the sock

24   with the bullet, and he tells Lieutenant Reed, found a bullet,

25   it was in his pocket, and then he discovers the crack cocaine

J14PPENH

1    and tells Lieutenant Reed, here, I think this is drugs.  So his

2    testimony today is corroborated.

3            And as to -- turning to a couple of points that

4    Mr. Joyce made, again, as to the legal points about what the

5    officers were supposed to do.  I mean, it can't be that the

6    officers were supposed to see Mr. Hilario and Mr. Pena running

7    down 12th Avenue, shrug their shoulders and let them go.  That

8    just can't be the right result here when there's shots fired

9    three minutes prior nearby, and they're running the exact

10   direction of flight reported over the radio.  That seems, to

11   me, to be the suggestion of defense counsel as far as the

12   reasonable police action here.

13           I want to address Mr. Joyce's argument about the

14   probable cause as to Mr. Hilario.  Your Honor saw the video,

15   and Lieutenant Reed testified that what he noticed that was

16   significant about that video was that Mr. Pena and Mr. Hilario

17   were working together, that those suspects were working

18   together.

19           And in his testimony, he gave a number of reasons why:

20   One, that Mr. Pena seemed to be directing Mr. Hilario; second,

21   Mr. Pena and Mr. Hilario ran off together.  They ran in the

22   same direction.  After Mr. Pena fires shots eastbound, both he

23   and Mr. Hilario run westbound.  So that was significant to

24   Lieutenant Reed's analysis of the video.  And then Lieutenant

25   Reed shows up at the -- ten minutes later and identifies them

J14PPENH

1    as the two suspects he saw in the video.  That's probable cause

2    to arrest them, your Honor.

3              And as to the $120, as an initial matter, there is

4    evidence in the record, in Officer Smith's body cam, that that

5    money was found on the ground, not recovered from Mr. Hilario's

6    person.  But if the defense is making an argument about a chain

7    of custody or anything else, I think a motion in limine would

8    address that issue, but we do think that that has been

9    addressed.

10             May I have a moment, your Honor?

11             THE COURT:  Yes.

12             (Pause)

13             MR. DAVIS:  Your Honor, unless you have any further

14   questions, we'll rest on our arguments and the record.

15             THE COURT:  Thank you very much.  So this was very

16   helpful argument in a very well-tried suppression hearing.  I'm

17   very grateful to all counsel.

18             Because we have a trial date, firm and fixed, of

19   February 4th, I need to get you a prompt decision.  So I will

20   get you a decision by no later than a week from today, but

21   hopefully even sooner than that.

22             Anything else we need to take up today?

23             Very good.  Thanks so much.

24             MS. SHARKEY:  Thank you, your Honor.

25             (Adjourned)

177

INDEX OF EXAMINATION

Examination of:                                    Page

JOSHUA THOMAS

Direct By Mr. Davis  . . . . . . . . . . . . 120

Cross By Ms. Sharkey . . . . . . . . . . . . 129

Cross By Mr. Joyce . . . . . . . . . . . . . 140

Redirect By Mr. Davis  . . . . . . . . . . . 141

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 B   . . . . . . . . . . . . . . . . . . . . . 131